# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>368 Gladys Avenue, Long Beach, California<br>90814 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   2:18-MJ-02928

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| See Attachment B | |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Postal Inspector Mark White
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and state:  Los Angeles, CA

_____
*Judge's signature*

Hon. Alexander K. MacKinnon
*Printed name and title*

AUSA: Veronica M.A. Alegría x3493

## ATTACHMENT A-1

### PREMISES TO BE SEARCHED

The property to be searched is the residence located at 368 Gladys Avenue, Long Beach, California 90814 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1 is a one-story house with an attached carport over the driveway. The exterior of SUBJECT PREMISES 1 is painted dark gray with white trim and a black roof. There are several windows facing the street on Gladys. The house number "368" is written diagonally in black lettering, located on a white pillar next to the adjoining driveway.

The areas to be searched at SUBJECT PREMISES 1 include: (a) all rooms, any attics, basements, porches, containers, and safes in SUBJECT PREMISES 1 (b) any garages, carports, bags, storage spaces, or other outbuildings belonging to SUBJECT PREMISES 1; and (b) any digital devices found at SUBJECT PREMISES 1.

**ATTACHMENT B**

<u>ITEMS TO BE SEIZED</u>

     1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 471 (Manufacturing Counterfeit Currency), 472 (Passing or Possessing Counterfeit Currency), and 371 (Conspiracy) (collectively, the "SUBJECT OFFENSES"), namely:

           a.    Counterfeit Federal Reserve Notes ("FRN");

           b.    Any and all altered, forged, counterfeited, or falsely made obligation or other security of the United States or any other country to include partial notes, uncut sheets, or security features associated with genuine currency.

           c.    Any records or documents of the distribution of counterfeit currency, including but not limited to, inventories, ledgers, receipts, journals, financial statements, check registers, notes, and correspondence;

           d.    Any tools, items, applications, or programs used or associated with the production of counterfeit currency or any other obligation or security, pattern notes and;

           e.    Any items, applications, or programs used to detect counterfeit currency, including detection pens, or to alter genuine currency, including bleaching products;

           f.    Any supplies, items, applications, or programs used in the production of counterfeit currency to include any byproducts of the production process;

g.     Bank statements, records, and records of wire transfers showing money paid or received for counterfeit currency;

h.     Telephone toll records and bills showing calls made to customers and/or business associates related to the sale/distribution of counterfeit currency;

i.     Travel documents, including but not limited to, passports, travel receipts, airline tickets, and charge receipts used in furtherance of the counterfeit distribution scheme;

j.     Records, documents, applications, or materials containing indicia of occupancy, residency or ownership of any location being searched including, but not limited to, rent receipts, utility company receipts, telephone bills, canceled checks, bank statements, canceled mail envelopes; and surveillance video;

k.     Currency, in any form, constituting the proceeds of the counterfeit distribution scheme;

l.     Any and all items obtained as a result of crimes committed;

m.     Any and all documents and items related to United States Postal Money Orders.

n.     Records, documents, programs, applications, or materials relating to any bank accounts, credit reports, credit card accounts, or other financial accounts and other personal identifying information;

o.     Records, documents, programs, applications, or materials relating to receipts or invoices for credit card

ii

purchases or activity not in the name of WOODS or HIGGINS but with the means of identification of another;

      p.   U.S. currency in excess of $1000;

      q.   Gold if worth is in excess of $1000;

      r.   Records, documents, programs, applications, or materials sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      s.   Records, documents, programs, applications, or materials sufficient to show SMS text, email communications, social media messages and accounts, or other text or written communications sent to or received from any of the digital devices and which relate to the SUBJECT OFFENSES;

      t.   Documents and keys relating to public storage units or safety deposit boxes; and

      u.   Any digital device used to facilitate the above-listed violations (and forensic copies thereof).

      v.   With respect to any digital device used to facilitate the above-listed violations:

         i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

          ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.   records of or information about Internet Protocol addresses used by the device;

          ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

iv

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## VIII.     SEARCH PROCEDURE FOR DIGITAL DEVICES

4.     In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as

soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain

vi

notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.    After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, with respect to any biometric sensor-enabled device that is within

the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and fingerprints of WOODS and HIGGINS onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of WOODS and HIGGINS with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Mark White, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint against, and arrest warrant for, Michael Bryan Woods ("WOODS") and Eric Ryan Higgins ("HIGGINS") for violations of Title 18, United States Code, Sections 472 (Passing Counterfeit Currency) and 2(a) (Aiding and Abetting).

2.     This affidavit is also made in support of an application for warrants to search the residence located at 368 Gladys Avenue, Long Beach, California 90814 ("SUBJECT PREMISES 1"), two white-colored storage units, located at Public Storage, 4295 Outer Traffic Circle, Long Beach, California 90804, Unit #1114 ("SUBJECT PREMISES 2") and Unit #1029 ("SUBJECT PREMISES 3"), and a gold-colored, 4-door, 2000 Dodge Durango, with California license plate number 7TYZ825 and vehicle identification number ("VIN") 1B4HS28N0YF276404 (the "SUBJECT VEHICLE"), as described more fully, respectively, in Attachments A-1, A-2, A-3, and A-4.

3.     The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 471 (Manufacturing Counterfeit Currency), 472 (Passing or Possessing Counterfeit Currency), and 371 (Conspiracy) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF POSTAL INSPECTOR WHITE

5. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS"), and have been so employed since August 2017. I am currently assigned to the Los Angeles Division, Mail Theft Team located in Long Beach, California. The Mail Theft Team investigates postal-related crimes, including theft of United States mail ("U.S. mail"), fraud, and related activity in connection with access devices that include credit cards and debit cards, identity theft, and unauthorized use of other persons' information for financial gain. The Mail Theft Team also investigates crimes related to the use, theft, or counterfeiting of postal keys (referred to as "arrow keys") and locks.

6. Previously, I was a Special Agent ("SA") with the United States Secret Service ("USSS"), Santa Ana Resident Office, Santa Ana, California. During that time, I completed a 10-week Criminal Investigation Training Program at the Federal

2

Law Enforcement Training Center, Glynco, Georgia, as well as an additional 17-week training program at the United States Secret Service James J. Rowley Training Center located in Beltsville, Maryland.  As an SA, my duties were to investigate violations of federal law, including fraud and related activity in connection with the fraudulent use of access devices, bank fraud, wire fraud, counterfeit United States currency, and identity theft. Prior to my employment with the USSS, I received my undergraduate bachelor's degree from Florida State University in Tallahassee, Florida, and my master's degree from American Military University, Charles Town, West Virginia.

### III. **SUMMARY OF PROBABLE CAUSE**

7.    WOODS and HIGGINS are involved in a scheme to possess and pass counterfeit Federal Reserve Notes ("FRNs") at United States Postal Service ("USPS") facilities throughout the greater Los Angeles and Orange Counties.  On April 2, 2018, WOODS and HIGGINS passed and attempted to pass counterfeit FRNs in Hawaiian Gardens, California.  On June 8 and 23, 2018, HIGGINS passed and attempted to pass counterfeit FRNs at the Torrance Post Office.  On August 29, 2018, HIGGINS attempted to pass counterfeit FRNs at two different post offices, and then drove away in the SUBJECT VEHICLE.  On September 11 and 17, 2018, HIGGINS passed and attempted to pass counterfeit FRNs at the Bay Station Post Office.

8.    USPIS placed a GPS tracker on the SUBJECT VEHICLE and followed HIGGINS and WOODS in the SUBJECT VEHICLE on October 18, 2018.  USPIS saw HIGGINS and WOODS drive to five different U.S.

Post Offices and pass or attempt to pass counterfeit FRNs.   On October 23, 2018, HIGGINS passed counterfeit FRNs at the La Mirada Post Office.

9.   SUBJECT PREMISES 1 is WOODS's residence and USPIS has seen WOODS parking the SUBJECT VEHICLE and then entering SUBJECT PREMISES 1 on multiple occasions, including after passing counterfeit FRNs.   WOODS pays for the storage units at SUBJECT PREMISES 2 and 3 and has accessed them multiple times in October 2018.

## IV. **STATEMENT OF PROBABLE CAUSE**

10.   Based on conversations with USPS employees, reviews of surveillance footage, as well as my conversations and examination of investigative reports prepared by law enforcement personnel who were involved in this investigation, I know the following:

**A.   WOODS and HIGGINS Passed or Attempted to Pass Counterfeit FRNs in April, June, August, and September**

1.   April Passes of Counterfeit FRNs at The Gardens Casino in Hawaiian Gardens, California

11.   The Casino Assistant Manager at The Gardens Casino in Hawaiian Gardens, California, victim J.H, reported to law enforcement officers that two white males, later identified as WOODS and HIGGINS as described below, came in approximately three hours apart and passed a total of $500 in counterfeit FRNs at the casino.   I have reviewed the surveillance photos from the casino and saw the first incident occurred when WOODS passed $200 in counterfeit FRNs at table #94.   WOODS then left the casino.   A few hours later, HIGGINS came in and attempted to

pass $300 in counterfeit FRNs. This second attempt to pass was unsuccessful and HIGGINS left the counterfeit FRNs behind and got into a waiting vehicle driven by WOODS.

12. The vehicle was also caught on surveillance and the photos show WOODS and HIGGINS leaving The Gardens Casino in a red Toyota Corolla bearing California license plate 7VGG385 (the "Toyota"). According to the California Department of Motor Vehicle ("CADMV"), the Toyota is registered to WOODS at SUBJECT PREMISES 1.

13. I have obtained the CADMV records for WOODS and HIGGINS and I am familiar with their appearance. I have identified WOODS and HIGGINS from The Gardens Casino surveillance videos.

### 2. June Passes of Counterfeit FRNs at the Torrance Post Office

14. On June 8, 2018, at the Torrance Post Office at 2510 Monterey Street in Torrance, California, a white male passed $200 in counterfeit FRNs. On June 23, 2018, the same male attempted to pass $100 in counterfeit FRNs. I obtained surveillance footage of both events and saw the same white male, who appears to me to be HIGGINS, pass and attempt to pass counterfeit FRNs on both aforementioned dates. Torrance Post Office provided me the $100 counterfeit FRN from the June 23, 2018 pass.

### 3. SUBJECT VEHICLE Seen After HIGGINS Attempted to Pass Counterfeit FRNs in August

15. On August 29, 2018, a white male, later identified as HIGGINS, attempted to buy gift cards using $400 in counterfeit

FRNs at the El Toro Post Office in Lake Forest, California. After the individual was unsuccessful, he exited the post office. A USPS employee described the individual in a manner consistent with HIGGINS, and also described him inside of a vehicle with the same description and license plate number as the SUBJECT VEHICLE. I have reviewed the surveillance footage from the incident and I recognized the male to be HIGGINS.

### 4. September Passes of Counterfeit FRNs at the Bay Station Post Office

16. On September 11, 2018, a white male, later identified as HIGGINS, passed counterfeit FRNs at the Bay Station Post Office in Newport Beach, California. According to USPS employees, HIGGINS purchased a $195 gift card and a $100 USPS money order using three $100 counterfeit FRNs.

17. On September 17, 2018, HIGGINS attempted to pass a counterfeit FRN at the same Bay Station Post Office. According to USPS employees, HIGGINS returned to the post office and attempted to purchase a gift card using one $100 counterfeit FRN, but was unsuccessful. HIGGINS then exited the post office and left the counterfeit FRN behind.

18. I reviewed the surveillance footage of both incidents and recognized the male to be HIGGINS.

### B. USPIS Saw WOODS and HIGGINS Pass or Attempt to Pass Counterfeit FRNs at Five Different U.S. Post Offices on October 18, 2018

19. On October 16, 2018, USPIS Inspector Matthew Markowski received a federal warrant authorizing the installation of a GPS tracking device for the SUBJECT VEHICLE. On October 17, 2018,

Inspector Markowski and I installed a GPS tracking device on the SUBJECT VEHICLE.

20.  On October 18, 2018, Inspector Markowski and I conducted surveillance of WOODS and HIGGINS using the GPS tracking device.  Inspector Markowski and I saw WOODS and HIGGINS driving in the SUBJECT VEHICLE as detailed below:

a.  At approximately 11:07 a.m., WOODS and HIGGINS, inside the SUBJECT VEHICLE, parked on Inglewood Avenue, in Hawthorne, California, near the Hawthorne Post Office. Inspector Markowski entered the Hawthorne Post Office and then saw WOODS enter the Hawthorne Post Office.  HIGGINS then later entered the post office.  Inspector Markowski saw that WOODS attempted to negotiate a USPS money order, but he was denied by a USPS employee because WOODS was not the payee listed on the money order.  Then Inspector Markowski saw HIGGINS purchase a USPS money order with cash.  After HIGGINS and WOODS exited the post office, Inspector Markowski seized the cash and obtained a copy of the transaction receipt.  HIGGINS had purchased a $300 postal money order with three $100 counterfeit FRNs.

b.  At approximately 11:50 a.m., WOODS and HIGGINS, inside the SUBJECT VEHICLE, parked at East Mariposa Avenue, in El Segundo, California, near the El Segundo Post Office. Inspector Markowski entered the El Segundo Post Office via the employee back room and saw HIGGINS standing in line.  Inspector Markowski attempted to observe HIGGINS via the post office's surveillance system, but it was not available for review. Inspector Markowski returned to the retail area to observe

7

HIGGINS, but HIGGINS was no longer in the post office.
Inspector Markowski spoke with the retail employee and learned
HIGGINS had just purchased a $400 postal money order with four
$100 counterfeit FRNs.  Inspector Markowski seized the
counterfeit FRNs and obtained a copy of the transaction receipt.

      c.   At approximately 12:19 a.m., WOODS and HIGGINS,
inside the SUBJECT VEHICLE, parked at the parking lot of the
Airport Post Office located at 9029 Airport Boulevard in Los
Angeles, California.  Inspector Markowski entered the Airport
Post Office and saw HIGGINS via the post office's surveillance
system.  Inspector Markowski saw HIGGINS purchase a postal money
order.  Then I entered the backroom of the Airport Post Office
and saw WOODS attempt to negotiate a postal money order.  The
USPS employee who handled the transaction obtained WOODS's
California driver's license and the postal money order and
showed it to me. I obtained a copy of the license and postal
money order.  Then the USPS employee processed the transaction.
I obtained copies of the transaction receipts and seized the
counterfeit $100 FRN HIGGINS passed to purchase the postal money
order.

      d.   At approximately 12:48 p.m., WOODS and HIGGINS,
inside the SUBJECT VEHICLE, parked nearby the La Tijera Post
Office located at 7381 La Tijera Boulevard in Los Angeles,
California. I entered the post office via the front door into
the retail area.  I saw HIGGINS attempt to purchase a postal
money order using cash.  Then HIGGINS left the post office
without the cash or a money order.  Inspector Markowski learned

from USPS staff that HIGGINS had tried to buy a $400 postal money order using four counterfeit $100 FRNs. The USPS staff believed the notes were counterfeit and refused the sale. The USPS kept the notes as contraband and HIGGINS left the post office. I seized the four counterfeit $100 FRNs. Inspector Markowski saw HIGGINS exit the post office and enter the SUBJECT VEHICLE via the rear passenger door; he also saw that WOODS was driving the SUBJECT VEHICLE.

      e.    At approximately 2:39 p.m., Inspector Markowski and I saw the SUBJECT VEHICLE parked facing south on Jefferson Boulevard in front of the Culver City Post Office located at 11111 Jefferson Boulevard in Culver City, California. Inspector Markowski entered the post office via the back room and saw HIGGINS in line and WOODS looking at various retail items. HIGGINS purchased a postal money order while WOODS appeared to serve as a lookout. After HIGGINS purchased the postal money order, HIGGINS and WOODS both exited the post office. Inspector Markowski obtained a copy of the transaction receipts and learned HIGGINS purchased a $199 postal money order and a $100 postal money order. Inspector Markowski seized the three counterfeit $100 FRNs.

### C.    HIGGINS Passed Counterfeit FRNs at a Post Office on October 23, 2018

    21.    On October 23, 2018, I received a call from a USPS employee who works at the La Mirada Post Office, located at 14901 Adelfa Drive, in La Mirada, California, indicating that at approximately 10:30 a.m., a white male came into the post office

and conducted three transactions using eight counterfeit $100 FRNs. The subject bought two gift cards, one greeting card, and one postal money order for $500. The USPS employee described the individual who successfully conducted the three transactions and the description fit HIGGINS.

22. I watched the La Mirada Post Office surveillance video and saw HIGGINS successfully conduct the three transactions utilizing counterfeit $100 FRNs. I obtained a copy of the transaction receipts and seized the eight counterfeit $100 FRNs.

**D. Confirmation of Counterfeit FRNs**

23. On or about September 29, 2018, I showed six counterfeit $100 FRNs that HIGGINS and WOODS had passed or attempted to pass in April and June 2018 to USSS SA Kyle Weeks, who reviewed the FRNs and confirmed them to be counterfeit. SA Weeks informed me he has been a USSS SA for three years, has conducted several investigations involving counterfeit FRNs, and was trained by the USSS to identify counterfeit FRNs.

24. On or about October 29, 2018, I showed 24 counterfeit $100 FRNs that HIGGINS and WOODS had passed or attempted to pass in October 2018 (including 15 from October 18, 2018) to USSS SA Jennifer Bruner, who reviewed the FRNs and confirmed them to be counterfeit. SA Bruner informed me she has been a USSS SA for one year, has conducted several investigations involving counterfeit FRNs, and was trained by the USSS to identify counterfeit FRNs.

### E. The SUBJECT PREMISES

#### 1. SUBJECT PREMISES 1

25. SUBJECT PREMISES 1 is WOODS's residence and where the Toyota and the SUBJECT VEHICLE are registered according to CADMV.

26. On August 2, 21, and 23, 2018, I conducted surveillance at SUBJECT PREMISES 1. On each of those dates, I saw the SUBJECT VEHICLE parked in front of SUBJECT PREMISES 1. On August 21 and 23, 2018, Inspector Markowski or I saw WOODS exit SUBJECT VEHICLE and enter SUBJECT PREMISES 1 through the front door.

27. On October 18, 2018, after WOODS and HIGGINS passed or attempted to pass counterfeit FRNs at five different post offices, Inspector Markowski and I saw WOODS park the SUBJECT VEHICLE at the Ralph's grocery store near SUBJECT PREMISES 1. WOODS exited via the driver's door and HIGGINS exited via the right rear passenger door. I then saw WOODS enter SUBJECT PREMISES 1.

#### 2. SUBJECT PREMISES 2 and 3

28. After the installation of a GPS tracking device on the SUBJECT VEHICLE, Inspector Markowski and I were able to establish routine vehicle stops made by the SUBJECT VEHICLE. On multiple occasions, the SUBJECT VEHICLE stopped at Public Storage, located at 4295 Outer Traffic Circle in Long Beach, California (the "Long Beach Public Storage").

29. On October 22, 2018, Inspector Markowski and I interviewed Long Beach Public Storage manager K.W. at the Long

11

Beach Public Storage.  K.W. stated WOODS is a customer of the
Long Beach Public Storage and WOODS leases storage unit number
#1114 (SUBJECT PREMISES 2) and pays the lease month-to-month.  I
reviewed the rental agreement obtained from K.W. and saw that it
confirms WOODS leases SUBJECT PREMISES 2.  K.W. stated WOODS
paid his October 2018 bill with a postal money order and WOODS
has used postal money orders to pay for his storage unit in the
past.

30.  K.W. also stated that WOODS makes the payments for
storage unit number #1029 (SUBJECT PREMISES 3), although "C.
Wilson," not WOODS, is the named leaseholder.  After viewing a
photograph of WOODS, K.W. confirmed that WOODS paid the monthly
lease payments for SUBJECT PREMISES 2 and 3 in person each
month.  K.W. has seen WOODS accessing both SUBJECT PREMISES 2
and 3.

31.  On October 26, 2018, another Long Beach Public Storage
employee provided Inspector Markowski with an "Activity Log" and
surveillance videos for SUBJECT PREMISES 3.  The Activity Log
detailed that "C. Wilson" accessed the Long Beach Public Storage
facility on October 17, 24, and 25, 2018.  However, on each of
the dates and times that "C. Wilson" accessed the Long Beach
Public Storage, video surveillance showed that WOODS was
entering the Long Beach Public Storage facility.  Based on my
training and experience, I know that those engaged in criminal
activity often rent storage units under false names in order to
conceal those units from law enforcement detection.

## V. TRAINING AND EXPERIENCE ON COUNTERFEIT CURRENCY

32. Based upon my training, experience, and conversations that I have had with other law enforcement officers and/or reports that I have read, I am aware that many criminals who manufacture counterfeit bills today are able to do so with a standard computer, scanner and color inkjet or multi-function printer using the following process:

a. A counterfeiter must find the right kind of paper to print counterfeit FRNs so that it will be more passable. Normal paper that is used on a day-to-day basis is made from cellulose found in trees; paper used for money is made from cotton and linen fibers. Rather than create their own paper, a counterfeiter can "bleach" genuine FRNs of lower denominations and print higher denominations on top of the genuine FRNs. The counterfeiter typically soaks the genuine FRNs in a solution made from bleach or other household cleaners and then wipes the ink off the genuine FRNs using a brush or hard plastic card such as a credit or hotel room card. The counterfeiter than lets the wet FRNs dry before the printing process.

b. A counterfeiter can place a bill of a higher denomination, such as a $100 FRN, onto the scanner. The scanner will create a 5 to 10 megabyte file on the computer's hard drive that will be used to print the counterfeit FRN, depending on the type of file chosen. Once the image is uploaded, a counterfeiter will use a graphics editor program such as Adobe Photoshop installed on his or her computer to change parts of the face of the FRN. Using a graphics editor program, a

13

counterfeiter can also set up "layers" of the FRNs security features, and subsequently print these layers to mimic the look and feel of multiple layers of ink found on genuine bills.

c.     A counterfeiter can then place the "bleached" genuine FRNs onto a blank piece of paper, and print the higher denomination FRNs onto the bleached genuine FRNs.  A counterfeiter typically has to test-print the scanned image a number of times and adjust the color to get the overall tone as close to the original as possible.  He or she will also have to scan the back plate of the FRN and practice aligning the front and back plates to get a realistic two-sided bill.

d.     Based on my training and experience, a counterfeiter will store the aforementioned items, such as specialized paper, software, digital devices used to make counterfeit FRNs, bleach, scanners, inks, and plates and images of currency in their homes, cars, and storage units.

e.     Based on my training and experience, I am aware that persons engaged in conspiracies to manufacture and possess counterfeit currency often communicate by cellular telephone calls, text messages, and emails using digital devices. Furthermore, based on my training and experience investigating counterfeiting schemes, I am aware that co-conspirators in such schemes often use cellular telephones to search the internet for information and guidance on the manufacture and detection of counterfeit currency.  Additionally, such persons will take photographs of the counterfeit currency and other contraband using digital devices.  Counterfeiters and their co-conspirators

14

store these digital devices in their homes, cars, and storage units.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

34.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and

software programs in use today that it is impossible to bring to
the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.
In addition, it may be necessary to consult with specially
trained personnel who have specific expertise in the types of
digital devices, operating systems, or software applications
that are being searched.

35. Digital data is particularly vulnerable to inadvertent
or intentional modification or destruction. Searching digital
devices can require the use of precise, scientific procedures
that are designed to maintain the integrity of digital data and
to recover "hidden," erased, compressed, encrypted, or password-
protected data. As a result, a controlled environment, such as
a law enforcement laboratory or similar facility, is essential
to conducting a complete and accurate analysis of data stored on
digital devices.

36. The volume of data stored on many digital devices will
typically be so large that it will be highly impractical to
search for data during the physical search of the premises. A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text. A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text. Storage devices capable of storing 500 or
more gigabytes are now commonplace. Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive

16

could contain as many as approximately 450 full run movies or 450,000 songs.

37.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[1] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve

---

[1] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment. Recovery also can require substantial time.

    38. Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant. Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole. Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file). Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used. Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords. Operating

systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use. Computer file systems can
record data about the dates files were created and the sequence
in which they were created. This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

39. Further, evidence of how a digital device has been
used, what it has been used for, and who has used it, may be the
absence of particular data on a digital device. For example, to
rebut a claim that the owner of a digital device was not
responsible for a particular use because the device was being
controlled remotely by malicious software, it may be necessary
to show that malicious software that allows someone else to
control the digital device remotely is not present on the
digital device. Evidence of the absence of particular data on a
digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

40. Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.

19

For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

41. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or

alphanumeric passcode or password.  These biometric features
include fingerprint-recognition, face-recognition, iris-
recognition, and retina-recognition.  Some devices offer a
combination of these biometric features and enable the users of
such devices to select which features they would like to
utilize.

     42.  If a device is equipped with a fingerprint scanner, a
user may enable the ability to unlock the device through his or
her fingerprints.  For example, Apple Inc. ("Apple") offers a
feature on some of its phones and laptops called "Touch ID,"
which allows a user to register up to five fingerprints that can
unlock a device.  Once a fingerprint is registered, a user can
unlock the device by pressing the relevant finger to the
device's Touch ID sensor, which on a cell phone is found in the
round button (often referred to as the "home" button) located at
the bottom center of the front of the phone, and on a laptop is
located on the right side of the "Touch Bar" located directly
above the keyboard.  Fingerprint-recognition features are
increasingly common on modern digital devices.  For example, for
Apple products, all iPhone 5S to iPhone 8 models, as well as
iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad
mini 3 or later, and MacBook Pro laptops with the Touch Bar are
all equipped with Touch ID.  Motorola, HTC, LG, and Samsung,
among other companies, also produce phones with fingerprint
sensors to enable biometric unlock by fingerprint.  The
fingerprint sensors for these companies have different names but
operate similarly to Touch ID.

43. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. To activate the facial-recognition feature, a user must hold the device in front of his or her face. The device's camera analyzes and records data based on the user's facial characteristics. The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

44. While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris

22

using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

45. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

46. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that

23

biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

47. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to any biometric sensor-enabled device that falls within the scope of the warrant: (1) compel the use

of WOODS and HIGGINS's thumb- and fingerprints on the device(s); and (2) hold the device(s) in front of the face of WOODS and HIGGINS with his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

48. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

49. For all the reasons described above, there is probable cause to believe that WOODS and HIGGINS have committed violations of Title 18, United States Code, Sections 472 (Passing Counterfeit Currency) and 2(a) (Aiding and Abetting).

//
//
//
//
//
//
//
//

50. I further submit that there is probable cause to believe that the items listed in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found in SUBJECT PREMISES 1, 2, and 3 and the SUBJECT VEHICLE, as described in Attachments A-1, A-2, A-3, and A-4.

_____
MARK WHITE, Postal Inspector
U.S. POSTAL INSPECTION SERVICE

Subscribed to and sworn before me
this 2nd day of November, 2018.

_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE

26